# UNITED STATES DISTRICT COURT
## *FOR THE SOUTHERN DISTRICT OF NEW YORK*

| |
|---|
| IN RE ADELE ZARZUR FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 |

Case No. 22-MC _____


**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S *EX PARTE* APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

I.     FACTUAL BACKGROUND ...........................................................................................3

     A.     The Parties .........................................................................................................3

     B.     Relevant Non-Parties .......................................................................................4

     C.     Background of the Zarzur Family Businesses and Petitioner ...........................5

     D.     Petitioner And Her Family Are Excluded From WZ Group By The Zarzur Brothers ...........................................................................................................6

     E.     Petitioner Uncovers Significant Financial Irregularities and Siphoning of Assets of the WZ Group and the Zarzur Brothers Refuse to Provide Further Information ...........................................................................................10

     F.     JPMorgan and the Zarzur Brothers Refuse To Voluntarily Provide Information Relating to the Target Entities .....................................................13

     G.     Petitioner Initiates the Brazilian Proceedings ................................................14

          1.     The Probate Inventory Proceeding ....................................................14

          2.     The Corporate Proceeding .................................................................16

     H.     Respondents Possess Highly Material Information For Use In Foreign Proceedings ....................................................................................................17

II.     ARGUMENT ...............................................................................................................19

     A.     Legal Framework ............................................................................................19

     B.     Petitioner Satisfies The Statutory Requirements Of 28 U.S.C. § 1782. ........21

          1.     Respondents "Reside" or are "Found" In The Southern District Of New York ...........................................................................................21

          2.     The Discovery Sought Is For Use In Foreign Proceedings.....................22

          3.     Petitioner Is An "Interested Person." ................................................23

     C.     All Of The Discretionary Factors Of Section 1782 Weigh In Favor of Permitting The Discovery Petitioner Seeks. ..................................................23

1.  The First Intel Factor Favors Granting Discovery Because Respondents Are Not Parties to the Foreign Proceedings. .......................24

2.  The Second Intel Factor Favors Granting Discovery Because the Brazilian Courts Will Be Receptive to the Requested Discovery..............24

3.  The Third Intel Factor Favors Granting Discovery Because The Application Is Made in Good Faith and Does Not Circumvent Any Proof-Gathering Restrictions. ....................................................25

4.  The Fourth Intel Factor Favors Granting Discovery Because The Requests Are Narrowly-Tailored and Proportional To The Needs Of The Foreign Actions. ...........................................................27

III.   CONCLUSION...............................................................................28

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017)................................................................................. 23

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
121 F.3d 77 (2d Cir. 1997)............................................................................. 20, 26

*In re Application of OOO Promnesfstroy*,
No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) ......................... 24

*Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*,
No. 17-MC-00216(VEC), 2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017) ............. 21

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998)........................................................................... 18, 27

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012).............................................................. 19, 20, 21, 22, 26

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
798 F.3d 113 (2d Cir. 2015)................................................................................. 23

*In re Edelman*,
295 F.3d 171 (2d Cir. 2002)................................................................................. 21

*Euromepa, S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995)........................................................................... 20, 25

*In re Gianoli Aldunate*,
3 F.3d 54 (2d Cir. 1993) ...................................................................................... 20

*In re Gushlak*,
No. 11-MC-218 NGG, 2012 WL 1514824 (E.D.N.Y. Apr. 30, 2012)................... 19

*Hertz Corp. v. Friend*,
559 U.S. 77, 93 (2010)........................................................................................ 21

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)................................................................................... *passim*

*In re Klein*,
No. 20-MC-203(PKC), 2022 WL 14786787 (S.D.N.Y. Oct. 26, 2022)............... 22

*In re Lane*,
No. 22 MISC. 34(LGS), 2022 WL 16737132 (S.D.N.Y. Nov. 7, 2022)............... 22

iv

*Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*,
    No. 17MC521, 2018 WL 679884 (S.D.N.Y. Jan. 29, 2018) .................................................. 21

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015)....................................................................................................... 3

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
    No. 1:08-cv-269 (LEK/RFT), 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008)...................... 27

*In re Pimenta*,
    942 F. Supp. 2d 1282 (S.D. Fla. 2013) ................................................................................. 22

*In re Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782*,
    No. 15-MC-417 (LAK), 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) .................................. 19

*In re Safra*,
    21-MC-640 (GHW) (JLC), 2022 WL 3584541 (S.D.N.Y. Aug. 2, 2022) ............................ 25

*Schmitz v. Bernstein Liebard & Lifshitz, LLP*,
    376 F.3d 79, 84 (2d Cir. 2004)............................................................................................... 25

*In re Tethyan Copper Co. Pty. Ltd.*,
    No. 21 MISC. 377(AT), 2022 WL 1266314 (S.D.N.Y. Apr. 28, 2022)................................ 19

## Statutory Authorities

28 U.S.C. § 1782....................................................................................................*passim*

Petitioner Adele Zarzur Kherlakian ("Petitioner") respectfully submits this Memorandum of Law in support of her *ex parte* Application and Petition (the "Application") pursuant to 28 U.S.C. § 1782 ("Section 1782"), for an order authorizing her to obtain limited discovery from JPMorgan Chase & Co ("JPMorgan"), The Clearing House Payments Company LLC ("CHIPS"), The New York Federal Bank of New York ("Federal Reserve Bank", and together with JPMorgan and CHIPS, the "Respondents") for use in judicial proceedings pending in Brazil, in the form of the attached subpoenas *duces tecum* and *ad testificandum* (the "Subpoenas").[1]

## PRELIMINARY STATEMENT

This Application arises from foreign probate and corporate governance proceedings concerning the assets of the late Waldomiro Zarzur, a prominent Brazilian engineer and founder of the Grupo Waldomiro Zarzur ("WZ Group"), who passed away in 2013.  Mr. Zarzur is survived by his wife and four children—Ricardo Zarzur and Roberto Zazur (the "Zarzur Brothers"), Gisele Zarzur Maluf, and Adele Zarzur (the Petitioner)—who are heirs to Mr. Zarzur's substantial fortune, which includes the WZ Group.  Recently, Petitioner identified several discrepancies in the financial records of the entities comprising the WZ Group (of which Petitioner is a shareholder and beneficial owner) and uncovered evidence that the Zarzur Brothers, as the *de facto* administrators of her father's estate, including the WZ Group, have concealed and siphoned over $40 million worth of assets out of the estate, depriving the Petitioner of her rightful inheritance and interests.  Accordingly, Petitioner initiated two

---

[1]  The Subpoenas are attached as Exhibit 2-5 to the Declaration of Lucas Bento, dated December 6, 2022 ("Bento Decl.").

proceedings in Brazil to (a) account for the assets of the estate and compel their distribution in accordance with Mr. Zarzur's wishes ("Probate Inventory Proceedings"), and (b) seek damages for the Zarzur Brothers' mismanagement of the WZ Group and its subsidiaries ("Corporate Proceeding", collectively, the "Brazilian Proceedings"). Some of these assets are held in accounts at JPMorgan (whose US employees, including New York-based advisors, oversaw) and other U.S. banking institutions. Petitioner brings this Application to obtain targeted evidence from JPMorgan, CHIPS, and the Federal Reserve Bank relating to these assets for use in the Brazilian Proceedings.

This Application meets all of the requirements of Section 1782. Respondents "reside or are found" in the Southern District of New York because they are headquartered here. The discovery sought by Petitioner is highly material and relevant to the issues at stake in the Foreign Proceedings. Indeed, the Brazilian court in the Probate Inventory Proceeding has already blessed Petitioner's request to "gather information from national and international banking institutions to locate assets [outside of Brazil]." Moreover, each of the discretionary factors laid down in the Supreme Court's *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241 (2004) decision favors authorizing the discovery sought by Petitioner: (i) Respondents are not parties to the foreign proceedings, and the Petitioner is otherwise unable to obtain the discovery in Brazil; (ii) the Brazilian courts will be receptive to discovery that the Petitioner seeks; (iii) the Application does not circumvent foreign proof gathering restrictions and is made in good faith; and (iv) the discovery sought is neither unduly intrusive nor burdensome. In addition, granting this Application would also further the "twin aims" of Section 1782: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign

countries by example to provide similar means of assistance to our courts."[2]  Accordingly, Petitioner respectfully requests that the Court grant Petitioner's Application and permit Petitioner to serve the Subpoenas on Respondents.

## I.    FACTUAL BACKGROUND

### A.    The Parties

*Adele Zarzur.*  Adele Zarzur, the Petitioner, is the lastborn child of the late Waldomiro Zarzur, a prominent businessman and engineer in Brazil.[3] Ms. Zarzur resides in São Paulo, Brazil.

*JPMorgan.*  JPMorgan is a bank headquartered at 383 Madison Avenue, New York, New York, 10179.[4]  JPMorgan acted as financial services provider to certain companies of the WZ Group, especially those located outside of Brazil, such as the Target Entities (see below).[5]

*CHIPS.*  CHIPS is a financial services institution headquartered in New York, New York.[6]  CHIPS acts as clearinghouse bank for U.S. dollar-denominated wire transfers between domestic and international banks.[7]

*Federal Reserve Bank.*  The Federal Reserve Bank is a bank headquartered at 33 Liberty Street, New York, NY 10045.[8]  As a provider of the Fedwire Funds Service through its

---

[2] *Mees v. Buiter*, 793 F.3d 291, 297–98 (2d Cir. 2015).

[3]  Declaration of Rudi Alberto Lehmann Jr., dated December 6, 2022 ("Lehmann Decl."), ¶8.

[4]  Bento Decl., Ex. 6.

[5]  Lehmann Decl., ¶43.

[6]  Bento Decl., Exs. 7-8.

[7]  Bento Decl., Ex. 13.

[8]  Bento Decl., Exs. 9-10.

Wholesale Product Office, the Federal Reserve Bank also acts as a wire-transfer clearing house for U.S. dollar-denominated wire transfers between domestic and international banks.[9]

### B.      Relevant Non-Parties

*Target Entities*.  The Target Entities are foreign (i.e. non-Brazilian) entities within or affiliated to the WZ Group include: Ecoinvesting International Corporation, Pensico Holdings Limited, Brown Stone Enterprises Inc., Tecon LLC, 4Z Worldwide Ltd., WZ Holdings Ltd., WZ Holdings LLC, Hospital Realty LLC, South Florida Preventative Care Initiative, RIZ Holdings LLC, ZZ Advanced Investments Ltd., Talihna Investments Ltd., Freebase Marketing Limited, Galaktik Consultants Limited, Rise One Business Administration Corp., Rise Business Administration Inc., Rwz Holdings Ltd., TWI One Company Ltd., and TWI Company Ltd., collectively (the "Target Entities").[10]  The Target Entities focus on several business industries, including real estate, construction, and healthcare.[11]

*WZ Group.*  WZ Group was founded by the late Waldomiro Zarzur in the 1960s and focused on construction projects and real estate developments, including the construction of the tallest skyscraper in São Paulo, the *Mirante do Vale*.[12]  In less than 20 years, the business matured into a diversified billion-dollar conglomerate comprised of over 70 different companies incorporated in Brazil and abroad, and operating in the construction, real estate, hotel, farming,

---

[9]  Bento Decl., Exs. 11-12.

[10]  Lehmann Decl., ¶9.

[11]  Lehmann Decl., ¶8.

[12]  Lehmann Decl., ¶8.

energy, and hospital industries.[13]   The Petitioner and her siblings have always held ownership interest, either as direct shareholders or beneficial owners, in the companies of the WZ Group.[14]

*Mr. Waldomiro Zarzur.*   Prior to his death, Mr. Waldomiro Zarzur was a Brazilian engineer and businessman, and head of the WZ Group.[15]   Mr. Zarzur was married to Ilda Zarzur and the couple had 5 children: (i) the Petitioner, Adele Zarzur; (ii) Renato (deceased); (iii) Roberto Zarzur; (iv) Ricardo Zarzur; and (v) Gisele Zarzur Maluf.[16]

*Roberto Waldomiro Zarzur*.   Roberto Waldomiro Zarzur is a businessman and sibling of Petitioner.   In the Brazilian Proceedings, Petitioner alleges that Roberto concealed and dissipated assets from Mr. Waldomiro Zarzur's estate and mismanaged the WZ Group.[17]

*Ricardo Waldomiro Zarzur*.   Ricardo Waldomiro Zarzur is a businessman and sibling of Petitioner.   In the Brazilian Proceedings, Petitioner alleges that Ricardo concealed and dissipated assets from Mr. Waldomiro Zarzur's estate and mismanaged the WZ Group.[18]

### C.   Background of the Zarzur Family Businesses and Petitioner

The Petitioner is the lastborn child of the late Waldomiro Zarzur, a prominent businessman and engineer in Brazil.[19]   Since the 1960s, the Zarzur family has owned a well-known real estate business empire, having made its mark by building São Paulo landmarks and

---

[13]   Lehmann Decl., ¶8.

[14]   Lehmann Decl., ¶10.

[15]   Lehmann Decl., ¶8.

[16]   Lehmann Decl., ¶10.

[17]   Lehmann Decl., ¶7.

[18]   Lehmann Decl., ¶7.

[19]   Lehmann Decl., ¶8.

offering low-income housing finance to first time home buyers.[20]  By the 1980s, the business matured into a diversified billion-dollar conglomerate comprised of over 70 different companies incorporated in Brazil and abroad, with activities in the construction, real estate, hotel, farming, energy, and hospital industries.[21]  These companies consist of operating and holding companies, with the latter maintaining bank accounts in Brazil and in other jurisdictions, such as the United States, Switzerland, the British Virgin Islands, and the Bahamas.[22]  Together with her siblings, Petitioner is a direct, indirect, or beneficial owner of these companies, which include the Target Entities.[23]

### D.   Petitioner And Her Family Are Excluded From WZ Group By The Zarzur Brothers

At the end of the 1980s, Mr. Zarzur started to plan his succession through his eldest son Renato, who, like him, was a successful engineer.[24]  However, Renato passed away in 1989, leading Mr. Zarzur to a profound depression.[25]  This was exacerbated when, in 1993, the Petitioner's  toddler child passed away.[26]  Such tragedies took a toll on Mr. Zarzur's health, which affected his ability to fully manage his business affairs.[27]

In 1994, a little over a year after Petitioner's son's passing, the Petitioner gave birth to a second son, who was born prematurely and required medical assistance and hospitalization for

---

[20]   Lehmann Decl., ¶8.

[21]   Lehmann Decl., ¶8.

[22]   Lehmann Decl., ¶8.

[23]   Lehmann Decl., ¶¶8-9.

[24]   Lehmann Decl., ¶11.

[25]   Lehmann Decl., ¶11.

[26]   Lehmann Decl., ¶11.

[27]   Lehmann Decl., ¶11.

approximately 6 months.  During this difficult time, and while Petitioner was focused

exclusively on the health of her son, the Zarzur Brothers persuaded their father to donate double

the ownership interest of *Empreendimentos Patrimoniais Santa Gisele Ltda.* ("Santa Gisele")—

WZ Group's main holding company—to them, leaving the Zarzur Brothers in a position of

corporate control as compared to their sisters.[28]  The Zarzur Brothers were each transferred 33%

of Santa Gisele (i.e. a combined 66% of the company's ownership interest), and Petitioner and

her sister Gisele 17% each, totaling 34%, which meant that Petitioner would not have any

significant role in the affairs of the company.[29]

At the time, Petitioner questioned her father about the disproportionality of this

distribution and its potential future consequences for her and her family, but her father and the

Zarzur Brothers assured her that the family would be taken care of as a whole and, specifically,

that the Zarzur Brothers would take care of her.[30]  Trusting their word, the Petitioner accepted

the arrangement and, as a consequence of her minor shareholding position, was not involved in

the daily affairs of the WZ Group.[31]

However, over time, the Petitioner noticed that the Zarzur Brothers influenced Mr. Zarzur

to sign broad power of attorneys and other documents conferring the Zarzur Brothers

---

[28]   Lehmann Decl., ¶12.  There is evidence that Respondent JPMorgan also manages the accounts of or otherwise advised Santa Gisele.  *See* Lehmann Decl., Ex. S.

[29]   Lehmann Decl., ¶12.  These percentages reflect further distributions made by Mr. Zarzur in 2003.  The original distribution was 26% to each brother, 10% to each sister, and 28% remaining with Mr. Zarzur.  *See id.*, fn. Ex. B.

[30]   Lehmann Decl., ¶13.

[31]   Lehmann Decl., ¶13.

increasingly broad and unfettered powers to manage the family's business assets as they pleased, excluding the Petitioner from management and decision-making roles.[32]

In 1997, Mr. Zarzur underwent heart surgery.[33]  In an effort to spare her father from any family disagreements, the Petitioner made inquiries about the family's business affairs directly with the Zarzur Brothers, who would always respond that they had the family business' best interests in mind and that the Petitioner should not question nor doubt their decisions.[34]  Over time, Petitioner was conditioned to accept the Zarzur Brothers' business decisions because inquiries would turn into arguments, which would in turn lead to major arguments, all of which would further deteriorate the health of their father.[35]

In October 2003, Mr. Zarzur, tired of the sibling rivalry, executed a succession plan which provided that the WZ Group was to be managed solely by him and, upon his passing, by the Zarzur Brothers, followed by Petitioner and Gisele ("Succession Plan").[36]  Mr. Zarzur made clear to his children that Petitioner and Gisele were to participate in family businesses as they pleased, including visiting and attending meetings at the company's headquarters in order to familiarize themselves with the day-to-day running of the businesses.[37]  In addition, the Recommendation Term, which was a document executed by Mr. Zarzur while he was still alive as part of his Succession Plan, states that Petitioner and Gisele shall be informed of any business

---

[32] Lehmann Decl., ¶14.

[33] Lehmann Decl., ¶15.

[34] Lehmann Decl., ¶15.

[35] Lehmann Decl., ¶15.

[36] Lehmann Decl., ¶16.

[37] Lehmann Decl., ¶16.

meetings and that they be present to discuss the issues at hand.[38]  The Recommendation Term also provided that his grandchildren be involved in the running of the family business.  Lastly, the Recommendation Term expressly provided that information about any transaction, regardless of its amount, including financial statements, reports and others, should be made available to all shareholders of the WZ Group, including Petitioner, upon request.[39]

The Zarzur Brothers did not act in accordance with their father's Succession Plan.[40] Petitioner holds no management position with the WZ Group's companies and has no access to relevant documents.[41]

Mr. Zarzur died in November 2013.[42]  The Petitioner took care of her father until his very last breath together with her mother, Ilda, including accompanying him on international trips to obtain medical treatment.[43]  For example, Petitioner (along with other family members) accompanied her father during his heart surgery in the United States and was always present when he was hospitalized.[44]

In December 2013, Mr. Zarzur's probate proceeding was filed with the São Paulo Family Court – 1st Department (the "Probate Court") (the "Probate Proceeding").[45]  The Probate Proceeding divided the assets of Mr. Zarzur's estate among the Zarzur Brothers, Gisele and

---

[38]  Lehmann Decl., ¶16.

[39]  Lehmann Decl., ¶16.

[40]  Lehmann Decl., ¶16.

[41]  Lehmann Decl., ¶16.

[42]  Lehmann Decl., ¶17.

[43]  Lehmann Decl., ¶17.

[44]  Lehmann Decl., ¶17.

[45]  Lehmann Decl., ¶18.

Petitioner.[46]  The Zarzur Brothers were the *de facto* administrators of the estate, which included the WZ Group, and were responsible for creating an inventory of the estate assets and distributing those assets to the beneficiaries, including Petitioner.[47]  This process was concluded in May 2016.[48]

    **E.**    **Petitioner Uncovers Significant Financial Irregularities and Siphoning of Assets of the WZ Group and the Zarzur Brothers Refuse to Provide Further Information**

Despite her initial belief that the Zarzur Brothers were acting in the best interests of the family as a whole, the Petitioner became increasingly suspicious of the Zarzur Brother's  lavish lifestyle while Petitioner's declined.[49]  This led Petitioner to investigate the WZ Group, particularly given the magnitude of its business activities across multiple industries and the lack of any internal controls in the businesses, including holding no de facto shareholder meetings or management meetings.[50]

Petitioner was unable to access the financial statements for the WZ Group and, given her exclusion from the management of the group, was never privy to the full list of subsidiaries of the WZ Group.[51]  Over the years, Petitioner requested that the Zarzur Brothers provide financial

---

[46]  Lehmann Decl., ¶18.

[47]  Lehmann Decl., ¶18.

[48]  Lehmann Decl., ¶18.

[49]  Lehmann Decl., ¶20.

[50]  Lehmann Decl., ¶¶20-21.

[51]  Lehmann Decl., ¶21.

statements for the WZ Group and, given her exclusion from the management of the group, the full list of subsidiaries of the WZ Group.[52]  Petitioner never received a satisfactory response.[53]

Without visibility of the corporate, administrative, and financial composition of the WZ Group, of which she is a shareholder and heir, Petitioner, in December 2021, hired an independent auditor to conduct an independent audit review of the WZ Group.[54]  The auditor requested several documents from the Zarzur Brothers to be able to perform his review and analysis of the Group's businesses.[55]  The Zarzur Brothers provided a limited set of the requested documents relating to 17 Brazilian WZ Group companies (out of the 70-plus companies that comprise the WZ Group).[56]

The auditor issued its preliminary report in May 2022 (the "Audit Report"), which details material irregularities in the Zarzur Brothers' management of the WZ Group.[57]  The Audit Report preliminarily concluded that the Zarzur Brothers committed grave accounting irregularities within  the WZ Group, including the use of "fictious" and "undisclosed" accounts to dissipate assets.[58]  Additionally, and based only on the limited documents made available to the auditor, the Audit Report shows that from 2010 to 2020, over R$220 million (U$41 million) of the companies' funds went missing from the group's books and records.[59]

---

[52] Lehmann Decl., ¶22.

[53] Lehmann Decl., ¶22.

[54] Lehmann Decl., ¶23.

[55] Lehmann Decl., ¶23.

[56] Lehmann Decl., ¶23.

[57] Lehmann Decl., ¶¶23-24.

[58] Lehmann Decl., ¶24.  Based on Petitioner's investigation, the Zarzur Brothers have also opened bank accounts in their father's name *after* his passing.  *Id.*, ¶30, n. 15.

[59] Lehmann Decl., ¶24.

Importantly, the Audit Report's conclusions were corroborated in a sworn witness statement by a former employee of the WZ Group, Mr. Márcio Rodrigues Liberado, a close confidant of the Zarzur Brothers.[60]  In July 2022, Mr. Liberado was fired by the Zarzur Brothers after he sent Petitioner financial spreadsheets evidencing the alleged fraudulent transfers made by the Zarzur Brothers.[61]  Mr. Liberado's witness statement was recorded and notarized and filed with the Brazilian police in an ongoing criminal investigation into Zarzur Brothers.[62]

In light of the auditor's findings concerning the management of the Brazilian entities of the WZ Group, Petitioner naturally started to raise questions about the foreign entities controlled by the WZ Group.[63]  These questions turned into grave concerns when Petitioner obtained a copy of Mr. Zarzur's revised income statement for the fiscal year of 2014-2015 ("Revised Income Statement"), i.e. one year after Mr. Zarzur's death.[64]  The Revised Income Statement shows several transfers, including supposed cash loan agreements transactions between Mr. Zarzur and Petitioner and transfers of bonds held by JPMorgan affiliates—transfers that were never received by Petitioner nor disclosed to her.[65]  Petitioner found it extremely suspicious that the Revised Income Statement allegedly reports funds being transferred to Petitioner when in fact she never received those transfers.[66]  It is unclear where those transfers ended up, but it appears to be an

---

[60]  Lehmann Decl., ¶25.

[61]  Lehmann Decl., ¶25.

[62]  Lehmann Decl., ¶25.

[63]  Lehmann Decl., ¶26.

[64]  Lehmann Decl., ¶26.

[65]  Lehmann Decl., ¶26.

[66]  Lehmann Decl., ¶26.

attempt to siphon estate assets disguised as transfers to Petitioner.[67]  The conclusions of the Audit Report, coupled with the suspicious transactions documented in Revised Income Statement left Petitioner with no other option but to seek judicial relief.[68]

On June 2, 2022, Petitioner filed a petition with the Probate Court to investigate and locate the assets of the estate and re-open her father's Probate Proceeding to redistribute those assets.[69]  Thus far, the Probate Court in the Probate Inventory Proceeding issued two favorable orders authorizing Petitioner to seek evidence from foreign financial institutions to further support her claim that the Zarzur Brothers have concealed a significant portion of Mr. Zarzur's estate.[70]

### F.    JPMorgan and the Zarzur Brothers Refuse To Voluntarily Provide Information Relating to the Target Entities

On June 2, 2022, Petitioner sent a Notice to JPMorgan that, *inter alia*, requested JPMorgan to provide the bank and portfolio statements of the Target Entities.[71]  However, JPMorgan refused to provide Petitioner with any documents, instructing her to contact the Zarzur Brothers *i.e.* the very individuals who Petitioner alleges have concealed and diverted the assets in

---

[67]  Lehmann Decl., ¶26.

[68]  Lehmann Decl., ¶26.

[69]  Lehmann Decl., ¶¶28-29.

[70]  Lehmann Decl., ¶¶33-34.  Once those assets are located and identified, Petitioner will be able to re-open the Probate Proceeding to redistribute the diverted assets.  Lehmann Decl., ¶¶41.

[71]  Lehmann Decl., ¶¶45-48.

question.[72]  Subsequent attempts by Petitioner and her counsel to obtain documents directly from JPMorgan on a voluntary basis have been fruitless.[73]

On July 18, 2022, Petitioner wrote to the Zarzur Brothers requesting them to produce same information.  On July 28, 2022, the Zarzur Brothers responded but did not address any of Petitioner's requests.

### G.    Petitioner Initiates the Brazilian Proceedings

Based on the Audit Report and the Revised Income Statement, Petitioner alleges that the Zarzur Brothers intentionally concealed assets from the Probate Proceeding, siphoned those assets out of the estate (including to foreign accounts), and deprived her of her rightful inheritance.[74]  Accordingly, Petitioner initiated two proceedings in Brazil against the Zarzur Brothers to (a) account for the assets of the estate and compel their distribution in accordance with Mr. Zarzur's wishes ("Probate Inventory Proceeding"), and (b) seek damages for their mismanagement of the WZ Group and its subsidiaries ("Corporate Proceeding", collectively, the "Brazilian Proceedings").[75]

### 1.    The Probate Inventory Proceeding

---

[72]  Lehmann Decl., ¶49.

[73]  Lehmann Decl., ¶¶50-57.  On June 25, 2022, Andrew Whitaker and Petitioner had a telephone call in which Mr. Whitaker confirmed JPMorgan has access to the financial information of the target entities but that it was unable to disclose it without authorization of the directors of those entities.  Petitioner explained that she is a shareholder of the entities and that she repeated her request to the information but Mr. Whitaker explained that was unable to help. *See id.* at ¶49.

[74]  Lehmann Decl., ¶27.

[75]  Lehmann Decl., ¶27.

As explained above, *supra* I.D, Mr. Zarzur's Probate Proceeding was initiated in December 2013, a month after his death.[76]   In light of the information uncovered by the independent auditor concerning the Zarzur Brothers' mismanagement and dissipation of estate assets, the Petitioner filed a petition with the Brazilian Probate Court on June 2, 2022 (the "June 2 Petition"), seeking to identify the assets concealed from the estate in order to redistribute those assets.[77]   Petitioner filed an amended petition on July 12, 2022 (the "July 12 Petition," collectively with the June 2 Petition, the "Probate Petitions").[78]   Specifically, the Probate Petitions requested the Probate Court to, *inter alia*, (i) order the reopening of the Probate Proceeding; (ii) authorize Petitioner to investigate Mr. Zarzur's domestic and foreign assets in financial institutions and to locate Mr. Zarzur's assets outside of Brazil; (iii) issue subpoenas to the central banking system of Brazil, the São Paulo Stock Exchange, the official Brazilian real estate registry and the Brazilian Securities and Exchange Commission; and (iv) summon the Zarzur Brothers to list all bank accounts and assets related to Mr. Zarzur either in Brazil or abroad, including any assets that the Zarzur Brothers have knowledge or have transferred for whatever reasons given the broad power of attorney conferred by Mr. Zarzur.[79]

In response to the Probate Petitions, the Probate Court issued an order on July 19, 2022 (the "First Probate Court Order")[80] authorizing, inter alia, Petitioner to investigate the estate

---

[76] Lehmann Decl., ¶28.

[77] Lehmann Decl., ¶29.

[78] Lehmann Decl., ¶31.

[79] Lehmann Decl., ¶30.  The Probate Inventory Proceeding is an adjudicatory proceeding where the Brazilian Probate Court acts a first-instance decision maker tasked with resolving disputes, including evidentiary disputes, collecting and reviewing evidence in order to resolve those disputes, and permitting certain of its decision to be appealed and become subject to further judicial review.  *Id.*, ¶35.

[80] Lehmann Decl., ¶33.

assets in foreign jurisdictions and bank accounts, so that Petitioner can specify the estate assets to be redistributed to support its claim to re-open the Probate Proceeding.[81]

On October 4, 2022, the Probate Court issued a second order (the "Second Probate Court Order") further authorizing Petitioner to investigate and locate assets related to Mr. Zarzur in Brazil *and abroad*.[82]  The Second Court Order expressly authorizes Petitioner "to gather information from national and international banking institutions to locate assets abroad in the name of [Mr. Zarzur]."[83]

2.     *The Corporate Proceeding*

Based on the Audit Report and additional evidence gathered by Petitioner concerning the mismanagement of the WZ Group by the Zarzur Brothers, on November 22, 2022, Petitioner filed a lawsuit before the São Paulo State Court – 2nd Chambers for Corporate Dispute Resolutions (the "Brazilian Corporate Court") (the "Corporate Proceeding").[84]  The Corporate Proceeding seeks to hold the Zarzur Brothers liable for the fraudulent mismanagement of the WZ group, which includes the Target Entities.[85]

In the Corporate Proceeding, Petitioner requests that the Zarzur Brothers indemnify the WZ Group entities (which, as noted above, also form part of Mr. Zarzur's estate) for their fraudulent misconduct, including all misappropriation of assets  by the Zarzur Brothers, as the

---

[81]   Lehmann Decl., ¶33.

[82]   Lehmann Decl., ¶34.

[83]   Lehmann Decl., ¶34.

[84]   Lehmann Decl., ¶36.

[85]   Lehmann Decl., ¶36.

WZ Group managing partners.[86]  As alleged by the Petitioner in the Probate Inventory

Proceeding and corroborated in the Audit Report, the Zarzur Brothers have been siphoning and

dissipating the family business assets since at least Mr. Zarzur's passing, through elaborate

accounting fraud, strawmen transactions, and other sophisticated maneuvers, such as opening

bank accounts in the name of Mr. Zarzur *after* his passing.[87]  In doing so, the Petitioner alleges

that the Zarzur Brothers breached their fiduciary duties of loyalty and diligence as managers of

the WZ Group by intentionally diverting corporate assets for their own personal use.[88]

## H.    Respondents Possess Highly Material Information For Use In Foreign Proceedings

The information Petitioner requests in this Section 1782 Application from the

Respondents will assist Petitioner's claims in the Foreign Proceedings by providing, *inter alia*,

further evidence pertaining to the Zarzur Brothers' concealment, siphoning, and diversion of

estate assets to foreign accounts.

Respondent JPMorgan assisted in the creation of (at least some of) the Target Entities and

has managed their accounts and financial investments.[89]  The account and portfolio statements of

those accounts would be critical to further show the assets that have been concealed from the

---

[86]  Lehmann Decl., ¶39.

[87]  Lehmann Decl., ¶¶39, 30 & n.15.

[88]  Lehmann Decl., ¶40.

[89]  Lehmann Decl., ¶63.  In August 2020, Tatiana Franco, of JPMorgan in New York corresponded with Petitioner and her siblings about financial information of WZ Group entities Santa Gisele, Freebase, Ecoinvesting, Brown Stone Enterprises, WZ Holdings, Pensico Holdings, Rise One Business Administration, and Tecon. Further, JPMorgan also appears to have handled or advised on some of the tax affairs of Mr. Zarzur around the time of his death.  For example, a W-8 form was executed by Mr. Zarzur and directed any mail to be sent to JPMorgan at 270 Park Avenue in New York, New York.  *See id.* ¶43.

estate and siphoned from these entities (which are part of the estate).[90]  Petitioner has already

requested information from JPMorgan to no avail.  For example, since at least June 2, 2022,

Petitioner made repeated requests to JPMorgan to obtain information relating to the Target

Entities, of which she is a direct or indirect beneficial owner or otherwise has an interest in their

assets.  JPMorgan has thus far refused to produce the information requested.[91]

Respondents CHIPS and Federal Reserve Bank (as a provider of the Fedwire Funds

Service through its Wholesale Product Office) are wire-transfer clearing houses located in this

District[92] that act as clearinghouse banks for U.S. dollar-denominated wire transfers between

domestic and international banks.  As the U.S. entities that process and settle wire transfers

between domestic and international banks, these Respondents almost certainly possess

information relating to wire transfers from the estate, including the Target Entities and

Waldomiro Zarzur accounts, to other accounts, including any controlled by the Zarzur Brothers.

In light of the Zarzur Brothers' concealment and diversion of assets, it is impossible for

Petitioner to identify these transfers without obtaining discovery from CHIPS and the Federal

Reserve Bank.

The Respondents are therefore likely to be in possession, custody, and control of

information highly material to the Foreign Proceedings.  This information would be relevant to

---

[90]  There is also evidence of the Zarzur Brothers requesting JPMorgan to transfer funds from one Target Entity to another. Lehmann Decl., ¶43.

[91]  Lehmann Decl., ¶¶45-57, Ex. V.

[92]  Bento Decl., Exs. 7-10.

Petitioner's Brazilian claims, as further explained in the Lehmann Declaration filed in support of

the 1782 Application.[93]

## II.    ARGUMENT

### A.    Legal Framework

Section 1782 of Title 28 of the United States Code permits United States District Courts

to grant discovery for use in a pending or "reasonabl[y] contemplat[ed]" foreign proceeding.

*Intel*, 542 U.S. at 259.  The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order
> him to give his testimony or statement or to produce a document or other thing for
> use in a proceeding in a foreign or international tribunal . . . . The order may be
> made . . . upon the application of any interested person.

28 U.S.C. § 1782.

Applications under section 1782 are routinely decided by this Court on an *ex parte*

basis.[94]  Such applications are based on "modest prima facie elements" in order to effectuate

"Congress's goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*,

146 F.3d 188, 195 (3d Cir. 1998); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*,

---

[93]   *See* Lehmann Decl., ¶¶61-65 & App'x A (explaining how each document request is relevant for the foreign claims and proceedings).

[94]   *See In re Tethyan Copper Co. Pty. Ltd.,* No. 21 MISC. 377 (AT), 2022 WL 1266314, at *1 (S.D.N.Y. Apr. 28, 2022) ("Courts routinely grant similar petitions ex parte"); *In re Gushlak*, No. 11-MC-218 NGG, 2012 WL 1514824, at *3 n.4 (E.D.N.Y. Apr. 30, 2012) (citing several cases, including from this district, and noting that "courts routinely grant § 1782 applications *ex parte*, limiting respondents' challenges to after the subpoena is served"); *In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, No. 15-MC-417 (LAK), 2016 WL 702327, at *1 n.3 (S.D.N.Y. Feb. 18, 2016) ("As typically or, at least, frequently is the case in § 1782 proceedings, leave to serve the subpoenas was granted *ex parte*, which is appropriate because all questions with respect to the propriety of the grant of leave and with respect to the content to the subpoenas are available to every subpoenaed party via a motion to quash or the defense of an application to compel compliance with the subpoenas.").

673 F.3d 76, 80 (2d Cir. 2012) ("[T]he statute has, over the years, been given 'increasingly broad applicability.'" (citing *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993)).

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn*, 673 F.3d at 80.

After determining that the three statutory requirements are satisfied, courts must then consider four discretionary factors in deciding whether to grant a Section 1782 application: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel*, 542 U.S. at 264-65.

Moreover, courts in this circuit "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A. v. R. Esmerian*, Inc., 51 F.3d 1095, 1097 (2d Cir. 1995); *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). Both the Supreme Court and the Second Circuit

have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings.  *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

### B.   Petitioner Satisfies The Statutory Requirements Of 28 U.S.C. § 1782.

Petitioner's 1782 Application satisfies the three statutory requirements of Section 1782: (1) Respondents reside or are "found" in the Southern District of New York; (2) the requested information is for use in the Foreign Proceedings; and (3) Petitioner is an "interested person" as the plaintiff in those foreign proceedings.

#### 1.   Respondents "Reside" or are "Found" In The Southern District Of New York.

Respondents reside or are "found" in this district because they are all headquartered in this district.[95]  *Hertz Corp. v. Friend*, 559 U.S. 77, 81, 93 (2010) (holding that a corporation's principal place of business "should normally be the place where the corporation maintains its headquarters"); *Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*, No. 17MC521, 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018) (noting that a corporation is found in the district where it is "essentially at home"); *Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*, No. 17-MC-00216 (VEC), 2017 WL 3841874, at *3 (S.D.N.Y. Sept. 1, 2017) ("[A] corporation is 'at home' for the purpose of constitutional due process only in a state that is the corporation's place of incorporation or its principal place of business.")

---

[95]   Bento Decl., Ex. 6 (JPMorgan headquartered in NYC), Exs. 7-8 (same for CHIPS), Exs. 9-10 (same for Federal Reserve Bank).

(*quoting Daimler AG v. Bauman*, 571 U.S. 117, 139 n. 19 (2014)) (emphasis added); *In re Lane*, No. 22 MISC. 34 (LGS), 2022 WL 16737132, at *2 (S.D.N.Y. Nov. 7, 2022) (holding that respondents headquartered in Manhattan reside or are found under Section 1782).  Accordingly, this statutory factor is satisfied.

> 2.    *The Discovery Sought Is For Use In Foreign Proceedings.*

The information sought in the proposed Subpoenas is "for use" in foreign proceedings. At the outset, the Brazilian Proceedings qualify as proceedings in a "foreign or international tribunal" for purposes of Section 1782.  Indeed, numerous courts have found that civil proceedings (including probate proceedings) before Brazilian courts satisfy Section 1782's requirements.  *See, e.g.*, *In re Klein*, No. 20-MC-203 (PKC), 2022 WL 14786787, at *1 (S.D.N.Y. Oct. 26, 2022) (authorizing §1782 discovery for use in Brazilian probate and inventory proceedings relating to "a long-running, intra-family dispute about which assets should properly be included in the estate of the [testator]"); *In re Pimenta*, 942 F. Supp. 2d 1282 (S.D. Fla. 2013) (authorizing 1782 discovery for use in secondary estate distribution proceeding in Brazil probate court); *In re Lane*, 2022 WL 16737132, at *2 (authorizing 1782 discovery to, inter alia, determine the location of partnership assets, for use in Brazilian civil proceedings). [96] Likewise, Petitioner's requested discovery is "for use" in the Foreign Proceedings.  Under Second Circuit law, Petitioner is not required to show that the information sought would be discoverable or admissible in the Foreign Proceedings.  *Brandi-Dohrn*, 673 F.3d at 82 ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it

---

[96]   Further, the Brazil Proceedings are adjudicative proceedings "in a foreign or international tribunal" for purposes of Section 1782 because, the Brazilian courts overseeing the Brazilian proceedings are first instance decision-makers tasked with resolving evidentiary disputes, collecting and reviewing evidence in order to resolve those disputes, and permitting certain of its decisions to be appealed and become subject to further review. *Intel*, 542 U.S. at 257, 259.

should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section

1782 application."). Rather, Petitioner only needs to show that it has "the *practical ability* . . . to

place a beneficial document—or the information it contains—before a foreign tribunal." *In re*

*Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017). Petitioner plainly satisfies this

requirement here. As explained above, *supra* I.H, and in the Lehmann Declaration, the

information sought in the Subpoenas is highly material and relevant to the Foreign

Proceedings.[97] Petitioner will use the evidence sought here to further support her allegations and

claims in the Foreign Proceedings.[98]

> ### 3.   Petitioner Is An "Interested Person."

Finally, Section 1782 requires persons seeking discovery to show that they possess a

reasonable interest in the foreign proceedings. While Section 1782 broadly covers those with the

right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts*

*&/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt

litigants are included among, and may be the most common example of, the 'interested

person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256. Petitioner is the plaintiff in the

Foreign Proceedings and is therefore an "interested person" under Section 1782.

### C.   All Of The Discretionary Factors Of Section 1782 Weigh In Favor of Permitting The Discovery Petitioner Seeks.

Each of the *Intel* factors weighs in favor of granting the requested discovery. *First*, the

Respondents are not parties to the Foreign Proceedings. *Second*, there is no reason to believe

that the Brazilian courts would be unreceptive to evidence obtained through Section 1782

---

[97]   Lehmann Decl., ¶¶61-65.

[98]   Lehmann Decl., ¶¶62.

discovery.  To the contrary, there's already evidence that they will be receptive to the evidence sought here.  *Infra* II.C.2.  *Third*, Petitioner is acting in good faith and is not seeking to avoid any foreign restriction on gathering evidence.  *Fourth*, Petitioner's narrowly-tailored document requests and request for limited testimonial evidence from JPMorgan are carefully circumscribed and targeted to key facts so as to avoid undue burden on the Respondents.

> 1.     *The First Intel Factor Favors Granting Discovery Because Respondents Are Not Parties to the Foreign Proceedings.*

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding.  "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding  . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."  *Intel*, 542 U.S. at 264.  Here, the Respondents are not parties to the Brazilian Proceedings and are beyond the subpoena powers of Brazilian courts.[99]

The first *Intel* factor therefore weighs in favor of discovery.

> 2.     *The Second Intel Factor Favors Granting Discovery Because the Brazilian Courts Will Be Receptive to the Requested Discovery.*

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to evidence obtained through Section 1782.  *See In re Application of OOO Promnesfstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing the second *Intel* factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782").  There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States, with the Second Circuit

---

[99]  Lehmann Decl., ¶65.

holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa*, 51 F.3d at 1102.  A court should deny discovery on the basis of lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added).  *See In re Safra*, 21-MC-640 (GHW) (JLC), 2022 WL 3584541, at *5 (S.D.N.Y. Aug. 2, 2022) ("objection to U.S. federal-court judicial assistance would have to come from an official source, such as an agent of the [foreign] government."); *Schmitz v. Bernstein Liebard & Lifshitz, LLP.*, 376 F.3d 79, 84 (2d Cir. 2004) (district court denied discovery request where German Ministry of Justice and local German prosecutor explicitly asked district court to deny it).

The Brazilian courts will be receptive to evidence obtained through this Application.[100] Indeed, on October 4, 2022, the Brazilian Probate Court authorized the Petitioner to locate and identify assets located abroad.[101]  Petitioner will have the opportunity to use the information obtained in this Application in advancing and proving his claims.[102]

Accordingly, the second *Intel* factor weighs in favor of discovery.

> 3.   *The Third Intel Factor Favors Granting Discovery Because The Application Is Made in Good Faith and Does Not Circumvent Any Proof-Gathering Restrictions.*

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the

---

[100]  Lehmann Decl., ¶66-67.

[101]  Lehmann Decl., ¶34.

[102]  *See* Lehmann Decl., ¶66-67.

United States." *Intel*, 542 U.S. at 265.  The *Intel* Court expressly rejected the notion that Section 1782 requires that the evidence sought must be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad.  *See Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the discoverability of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in the foreign proceeding.  As in *Intel*, there is no statutory basis for any admissibility requirement."); *Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts.").  Nor is there any requirement that Petitioner must exhaust his remedies in the foreign court first.  *See In re Metallgesellschaft AG*, 121 F.3d at 79 ("[A] 'quasi-exhaustion requirement' finds no support in the plain language of the statute and runs counter to its express purposes.").

Here, there is no reason to believe that any of the discovery sought violates any foreign laws and/or public policy.  Indeed, Brazilian laws do not prohibit the collection of information sought via this Application.[103]  Brazil does not have any law or public policy against such discovery.  Indeed, the fact that the Brazilian probate court has authorized Petitioner to locate the estate's assets abroad is a strong indication that such discovery does not contravene Brazilian law.[104]  Accordingly, the third *Intel* factor weighs heavily in favor of granting Petitioner's Application.[105]

---

[103]  Lehmann Decl., ¶66.

[104]  *Id*.

[105]  Lehmann Decl., ¶66-67.

4.     *The Fourth Intel Factor Favors Granting Discovery Because The Requests Are Narrowly-Tailored and Proportional To The Needs Of The Foreign Actions.*

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265.  The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure.  "The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute." *In re Bayer AG*, 146 F.3d at 195.

Here, the *3 document requests* for each Respondent (and corresponding deposition topics for JPMorgan) are narrowly tailored and directly relevant and proportional to the issues in the foreign proceedings.  *See* Lehmann Decl. ¶¶61-65 (discussing relevance of information); *id.* at Appendix A (outlining how each document request is relevant to the issues in the Brazilian Proceedings).  As noted above, the Petitioner and JPMorgan have already engaged in correspondence about these requests, including Petitioner's request to preserve documents and communications relevant to these matters.  Responsive documents should thus be easily identifiable, readily accessible, and not burdensome for JPMorgan and the other Respondents to produce.[106]

Moreover, if Respondents reasonably believe that any documents present any confidentiality concerns, Petitioner is willing to consider accommodating such concerns, such as by stipulating to a protective order. *See, e.g. Minatec Fin. S.A.R.L. v. SI Group Inc*., No. 1:08-

---

[106]   In the unlikely event, however, that this Application and the desired discovery create a burden or other issues for JPMorgan or the other Respondents, Petitioner would be more than willing to accommodate and confer with them to resolve any such issues in good faith.

cv-269 (LEK/RFT), 2008 WL 3884374, at *1 (N.D.N.Y. Aug. 18, 2008) ("[T]he beauty of §

1782 is that it permits this Court to impose a protective order that would extinguish any concern

that privileged, confidential, or proprietary information would be indecorously revealed.")

Accordingly, the fourth *Intel* factor weighs heavily in favor of granting Petitioner's

Application.

## III.   CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the *Ex

Parte* Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed

Order attached to the Bento Declaration as Exhibit 1, (c) authorize Petitioner, pursuant to 28

U.S.C. § 1782, to serve the Subpoenas on Respondents; and (d) grant any and all other relief to

Petitioner as deemed just and proper.

Dated: December 6, 2022                          Respectfully submitted,

Lucas Bento
Robert A. Zink (*pro hac vice* application forthcoming)
QUINN EMANUEL URQUHART & SULLIVAN
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: 212-849-7000
lucasbento@quinnemanuel.com
robertzink@quinnemanuel.com

Gavin S. Frisch (*pro hac vice* application forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Phone: 617-712-7100

gavinfrisch@quinnemanuel.com

-and-

Gabriela Menna Barreto Scanlon (*pro hac vice*
application forthcoming)
MB SCANLON PLLC
4301 50th Street NW, 1st Floor
Washington, D.C., 20016
Phone:  (202) 410-9293
gabriela@mbscanlon.com